UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

In Re Mortgage Foreclosure Cases            Misc. No.:  11-mc-88-M-LDA

## DEFENDANT MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. MEMORANDUM IN OPPOSITION TO PRELIMINARY INJUNCTION

This memorandum is respectfully submitted in response to the United States District Court for the District of Rhode Island Order dated June 19, 2013 (the "RI District Court Order") which invited briefs from the plaintiffs and defendants assigned to the District Court's docket number 11-mc-88-M-MDA, on the issue of whether the District Court's stay of litigation, which the United States Circuit Court of Appeals for the First Circuit determined to be an injunction, meets the requirements for issuance of an injunction.  In addition this memorandum addresses the issues raised by the United States Court of Appeals for the First Circuit in its Judgment and Opinion issued on June 14, 2013 (the "First Circuit Judgment") in the above-entitled action.

Specifically, this memorandum focuses on the unique role of Mortgage Electronic Registration Systems, Inc. (MERS) as a defendant in over 800 actions pending before the District Court In Re Mortgage Foreclosure Cases: Number 11-mc-88-M-LDA (the "Mortgage Foreclosure Docket").  MERS respectfully submits that it is a lawful mortgagee, as nominee for various lenders, their respective successors and assigns pursuant to the laws of the State of Rhode Island.  As will be discussed more fully, MERS has the requisite authority to hold mortgage liens, effectively assign those mortgages or foreclose the liens, including by exercise of the statutory power of sale as provided by the mortgage contract and the General Laws of the State of Rhode Island.  Moreover, MERS respectfully submits that the stay established by the

District Court does not meet the requirements of Federal Rules of Civil Procedure 65 with respect to granting of a preliminary injunction and that such stay should be terminated.

## I.      Facts and Travel

MERS assumes the District Court is fully familiar with the facts of the mortgages and cases involved in the Mortgage Foreclosure Docket.  For the sake of brevity, the full statement of facts is not restated here.  Plaintiffs in these cases are typically mortgagors who own property in Rhode Island, but who have defaulted on their mortgage loans, and to this date have not cured such defaults.  They are therefore subject to all of the remedies provided to the respective mortgagees by the mortgage loan contracts that these mortgagors willingly and knowingly agreed to, when they signed their respective mortgage loan promissory notes and mortgages and accepted their lenders' disbursement of significant loan proceeds.  In a unique twist of legal posture, these defaulted mortgagors have brought suit to prevent foreclosure or eviction in otherwise lawful foreclosures or seek to quiet title when title has already been lawfully divested. These lawsuits against their respective lenders, servicers or current assignee of the mortgage loan are premised on the bizarre, and unfounded hypothesis that their lenders, in conjunction with MERS, have committed fraud in their mortgage loan contracts, or the assignments of their mortgages contain defects caused by MERS.  Therefore, they suggest the assignments by MERS are invalid and thus the assignees of the mortgages do not have the right to foreclose on the subject properties, or should otherwise not be allowed to take possession via lawful eviction proceedings.  Typically, the plaintiffs' complaints allege that the party invoking the statutory power of sale to foreclose is not a lawful assignee of the original lender because MERS lacks the power to assign.  These cases were consolidated by the District Court on one Mortgage Foreclosure Docket by order dated August 16, 2011.  The Order stayed all foreclosure

proceedings and directed the parties to settle the lawsuits through a special master who would assist to mediate such settlements. (the "Stay Order"). Whereas, the history of this docket demonstrates that over several years, very few cases have settled, and the Stay Order has prevented lawful mortgagees from exercising their lawful rights to foreclose or evict defaulted mortgagors, or otherwise prevented the mortgagees from transferring the collateral that they received as part of their lawful mortgage loan contracts with their mortgagors. In 2011, the Mortgage Foreclosure Docket may have started as a helpful vehicle to manage many lawsuits with common allegations and many parties, but by 2013, the docket has grown to include over 800 cases, and growing almost every day with more cases filed by the same attorneys using similar complaints, all with a focused attack on MERS as the alleged bane of residential mortgage loan finance.

The constant, but false argument running through the continuous barrage of over 800 complaints in the Mortgage Foreclosure Docket is the unsupported and wholly unjustified attack on MERS and its alleged inability to hold, assign, or enforce interests it holds as mortgagee, as nominee for the original lender, or its successor and assigns. To cite by way of example, in *Paulino v. Mortgage Electronic Registration Systems, Inc., et. al.*, CA 11-605 filed December 6, 2011 (attached hereto as Exhibit B) and *Beckwith v. Mortgage Electronic Registration Systems, Inc., et al.*, CA 12-830 filed November 14, 2012 (attached hereto as Exhibit C), the plaintiff in each complaint makes several similar allegations, among others, that MERS does not hold any legal or beneficial interest in the mortgaged property, the plaintiffs challenge MERS' right to assign the note, MERS lacks "capacity to be a mortgagee", MERS splits the note and mortgage, MERS' mortgage assignment is void, and MERS lacks the right to invoke Rhode Island's statutory power of sale.

Not much has changed in these complaints, submitted by the same plaintiffs' counsels since the Rhode Island Supreme Court issued its defining decision in *Bucci v. Lehman Brothers Bank*, No. 2010-146-Appeal, 2013 R.I. Lexis 52 (April 12, 2013), which resolved the allegations and claims stated in these lawsuits in favor of MERS and the lenders and servicers who use MERS as a nominee, and their successors and assigns in mortgage loan transactions in Rhode Island.  As will be discussed more fully *infra,* among other things, the *Bucci* Court affirmed MERS' designation as grantee of a mortgage, or the mortgagee as nominee for the lender and its successors and assigns, and that MERS has authority to exercise Rhode Island's statutory power of sale embodied in the uniform mortgage contract, that has been approved for use by the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"), and is regularly accepted by other purchasers and parties in the multi-trillion dollar secondary mortgage market.  See the accompanying Declaration of Brian Blake dated July 3, 2013 (¶¶ 3, 8) attached hereto as Exhibit A (the "Blake Dec.").

Even after *Bucci¸* as evidenced by the complaint *in Alves v. Mortgage Electronic Registration Systems, Inc, et al.* CA 13-338, filed May 10, 2013 (attached hereto as Exhibit D), complaints similar to *Paulino* (filed December 6, 2011) and *Beckwith* (filed November 15, 2012) continue to add to the already burdened Mortgage Foreclosure Docket, and continue to blatantly allege, among other things, that MERS needed to grant and record a power of attorney to HSBC, its assignee ¶ 13; MERS never holds a beneficial interest in the mortgaged property ¶ 18; MERS cannot act as an agent for the lender ¶¶ 21, 23; assignments by MERS are void ¶¶ 20, 24,  25; the mortgagee or its assignee may not invoke the statutory power of sale ¶¶ 32, 39, 41; and the mortgage is unsecured or otherwise void ¶¶ 64, 65, 66, 67.  In *Alves*, plaintiff makes these various allegations against MERS which are directly contrary, not only to the *Bucci* decision, but

4

also various other decisions issued by the Rhode Island Superior Court in its mortgage foreclosure docket.  Attached as Exhibit E is a copy of the Mortgage executed by Dino Alves and Robin Alves, together with the Assignment of Mortgage to HSBC Mortgage Servicing, Inc.  as recorded in the Office of the Town of Johnston Clerk (collectively the "Alves Mortgage").  A comparison of this Mortgage to the mortgage that was the subject of the *Bucci* decision demonstrates that they contain the same provisions except for the dates, names of the parties, property description and loan amount.

Plaintiffs', represented by a repeated number of counsel,  constant attack on MERS is the basis for most, if not all, of the complaints filed in the Mortgage Foreclosure Docket, and particularly in the wake of *Bucci,* flies in the face of established Rhode Island law.  But for the District Court's order staying all further proceedings, these unfounded complaints should be dismissed pursuant to straightforward motions to dismiss, motions for judgment on the pleadings or motions for summary judgment—just as they are dismissed with regularity in the Rhode Island Superior Courts.[1]  Moreover, as a result of this Court's stay, MERS has been deprived of an opportunity to refute the baseless or irrelevant allegations made by the plaintiffs, which is harmful to MERS' reputation, and to exit from the seemingly endless litigation, after it has lawfully assigned its legal title in substantially all of the mortgages included in the Mortgage Foreclosure Docket.[2]

---

[1] A review of the Rhode Island Superior Court docket, indicates that the Court has not sustained any of the various plaintiffs' "MERS allegations" over the last several years of wrongful foreclosure suits.

[2] Subsequent to the *Bucci* decision issued by the Rhode Island Supreme Court, MERS wrote to each of the plaintiff attorneys specifically requesting that they discontinue their lawsuits against MERS and strike those allegations challenging MERS' role in mortgage loan transactions.  See the MERS' counsel letter to the plaintiffs' attorneys dated May 1, 2013 attached hereto as Exhibit F.

## II.    The MERS® System

Prior to its analysis and determinations, the Supreme Court in *Bucci*, began with "a description of MERS and the role that it plays in the mortgage industry." *Bucci* at *3. This memorandum incorporates the Supreme Court's presentation of MERS, and will not repeat the Supreme Court's understanding of MERS, but in light of plaintiffs' contorted view of MERS and how the mortgage lending industry works with MERS, several points need to be stated. For several decades the residential mortgage industry has been comprised of two interconnected markets. *See Jackson v. Mortgage Electronic Registration Systems, Inc.*, 770 N.W.2d 487, 490 (Minn. 2009). The primary market consists of mortgage backed loans made to consumers, loans typically evidenced by a promissory note and secured by a security instrument. *Id.* Many originating lenders will then sell the indebtedness evidenced by the promissory notes, or mortgage loans, on the secondary market to entities such as Fannie Mae or Freddie Mac, or to private investment banks or other institutional investors, *see id.*; *see also* Gerald Korngold, *Legal and Policy Choices in the Aftermath of the Subprime and Mortgage Financing Crisis*, 60 S.C.L.Rev. 727, 729 (2009), providing the loan originators – mortgage brokers, mortgage companies, and local banks – with a return of their capital to make more home loans to more potential home owners. *Id.*

Once purchased in the secondary mortgage market, an entity that owns the loan may pool it with others and transfer ownership of the pool to a trust. *See Horvath v. Bank of New York, N.A.*, 641 F.3d 617, 620 (4th Cir. 2011); *In re Securities Capitol Assurance, Ltd. Securities Litigation*, 729 F.Supp.2d 569, 575 (S.D.N.Y. 2010). The trust then issues debt securities that investors can purchase shares in, with the pooled loans serving as collateral for the securities. The securities often represent different groups or "tranches" of the loans in the trust, grouped and

priced according to their expected risk of default. *In re Securities Capitol Assurance,* 729 F.Supp.2d at 575. The securities thus represent a right to certain payments that are derived from the monthly interest and principal payments made under the pooled loans, and the investors either hold their shares in the security, or trade them in the markets for such securities. *See* Korngold, 60 S.C.L.Rev. at 729. This secondary mortgage market process, involving high volume transfers of secured debt, creates new capital for the primary market, creating greater access to residential home loans.

In 1993, several leading participants in the real estate finance industry developed an electronic registration system for tracking the transfer of interests in the secured debt instruments, or purchased for securitization in the secondary mortgage market, a system much like the book-entry system successfully used by the Depository Trust Company for the securities industry since the 1970s. R.K. Arnold, *Yes, There Is Life On MERS*, 11 Prob. & Prop. 32, 33-35 (Aug. 1997). Fannie Mae, Freddie Mac, the Government National Mortgage Association ("Ginnie Mae"), and the Mortgage Bankers Association of America joined forces with other major mortgage banking institutions to create a national electronic registration system and clearinghouse – the MERS® System. *Merscorp, Inc. v. Romaine*, 861 N.E.2d 81, 8 N.Y. 3d 90 (N.Y. Ct. App. 2006). The MERS® System, which has been fully operational since 1997, tracks transfers of the beneficial ownership interests in mortgage backed loans.[3]

---

[3] The MERS® System also tracks changes in servicing rights among its members. The servicer services the loan for the ultimate investor, owner(s) of the beneficial interests in the indebtedness evidenced by the note, receiving and processing loan payments and payoffs; dealing with tax and insurance escrows; handling delinquencies, forbearance, and modifications; and interacting with borrowers. *See, e.g., Deerman v. Fed. Home Loan Mortg. Corp.*, 955 F.Supp. 1393, 1396 (N.D. Ala. 1997). Knowing the identity of the servicer – not the identity of the investor(s) who typically does not interact with a borrower – is what is most essential to the homeowner, because the servicer has been contracted to handle the day-to-day servicing responsibilities just as it did before the advent of the MERS® System. See Blake Dec. ¶¶ 11,12.

7338021.2

In addition to the MERS® System which is owned and operated by MERSCORP Holdings, Inc., a separate entity—MERS—serves as the disclosed record mortgagee and common nominee (or agent) for the mortgage lending industry in the United States. Blake Dec. ¶ 3; *See also MERS v. Bellistri*, 2010 U.S. Dist. LEXIS 67753 at 12-19 (E.D. Mo. 2010). In that capacity, MERS serves as the mortgagee of record (in mortgage states) or as beneficiary (in deed of trust states) of the security agreements securing the promissory notes that evidence the debt. Allen H. Jones, *Setting the Record Straight on MERS, Mortg. Banking*, 34, 36 (May 2011). MERS' role as mortgagee is fully disclosed, agreed to by the borrowers, established in the security agreements, and duly recorded in county land records. All persons having an interest in the property are, therefore, on notice of the security interest and the party expressly designated as mortgagee or beneficiary.

MERS becomes the mortgagee of record by being named expressly by the borrower and appointed by the lender as mortgagee in the mortgage when the loan is originated, or by assignment of mortgage to MERS. Once designated the mortgagee, MERS remains the mortgagee when beneficial ownership interests or servicing rights to the loan change. Blake Dec. ¶ 10. Those transactions do not occur through the MERS® System —they occur outside of it—but they are electronically tracked in the MERS® System. At all times, the MERS mortgage or any assignment to MERS is recorded in the public land records, keeping the public on record notice of the security interest in the property, as well as MERS' role as mortgagee and disclosed nominee for the lender, its successors and assigns. Blake Dec. ¶ 10. Usually the promissory note is not recorded with county recorders. When a lender transfers its beneficial interest in the promissory note, MERS retains its fiduciary obligations to the lender, its successors and assigns. MERS continues to act as the mortgagee for the new note holder(s) because the benefit of the

security instrument follows the note.  MERS does not, however, originate any mortgage loans, rather MERS Member lenders are the usual originators.  Blake Dec. ¶ 4.

Beneficial ownership interests in these loans transfer through negotiation of the promissory note by endorsement and delivery, in accordance with the Uniform Commercial Code.  *See* Rhode Island General Law ("R.I. Gen. Laws") §§ 6A-3-104(a), (b); 6A-3-203; 6A-3-205.  The promissory note is a negotiable, intangible asset, which has value to the financial institutions and investors.  Like other promissory notes, the right to receive payments under a loan is legally transferred when one holder negotiates the note to another by endorsement and delivery.  *See* R.I. Gen Laws §§ 6A-3-203; 6A-3-205.

Since the mid-1990s participants in the mortgage industry have been able to subscribe as members of the MERS® System ("MERS® System Members" or "Members"), and register their loans in the MERS® System database.  *Jackson*, 770 N.W.2d at 490.  Once MERS Members, they are contractually obligated under the MERS® System Rules of Membership and other lesser included documents to abide by certain terms, conditions, rules and procedures.  *See* Exhibit 3, attached to the Blake Dec. ¶ 14.  Lenders who are MERS® System Members can elect to designate MERS as its nominee with respect to the mortgage securing the loan, and if it does so, the Member "cause[s] MERS to appear in the appropriate public land records as the Mortgagee of record as Nominee for the Note Owner and its successors and/or assigns with respect to each mortgage loan that the Member registers on the MERS® System."  Blake Dec. ¶14, and Exhibit 3, Rule 2, Section 4. Under the uniform mortgage contract and the MERS Rules of Membership, MERS serves as the mortgagee of record "as Nominee of the Note Owner and the Note Owner's successors and/or assigns, including the Note Holder with respect to each

7338021.2

MERS Loan that a Member registers on the MERS® System." *See* Exhibit 3 to the Blake Dec,

Rule 2, Section 5.  In that capacity:

> In the absence of contrary instructions from the Note Owner,
> MERSCORP Holdings and MERS may rely on instructions from
> the Servicer or Subservicer shown on the MERS® System in
> accordance with Rules and the Procedures with respect to transfers
> of legal title of the Note or Mortgage, transfers of contractual
> servicing rights, and releases of any security applicable to such
> mortgage loan.

*Id.*

As a consequence of designating MERS as the mortgagee of record on the mortgage or

other security instrument recorded in the land evidence records, Members of the MERS® System

effectively use MERS to serve as their common agent to hold mortgagee interests on behalf of

each successive beneficial interest holder in the promissory note secured by the mortgage. *Bucci*

at *3, *see also Jackson, supra*, 770 N.W.2d at 490.  When one MERS Member transfers the note

to another MERS Member, the Members electronically track that transfer within the MERS®

System, but MERS remains the mortgagee of record in the land evidence records for the new

beneficial owner of the note.  *Id.*

## III.    Preliminary Injunction Standard

In deciding a motion for a preliminary injunction pursuant to Federal Rule of Civil

Procedure 65, a district court typically must consider four elements: (1) the probability of the

movant's success on the merits; (2) the prospect of irreparable harm absent the injunction; (3) the

balance of the relevant equities (focusing upon the hardship to the movant if an injunction does

not issue as contrasted with the hardship to the nonmovant if it does); and (4) the effect of the

court's action on the public interest. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d

12, 15 (1st Cir. 1996); *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 5 (1st Cir. 1991).

10

However, "the sine qua non of this four prong standard is whether the plaintiffs are likely to succeed on the merits." *Gately v. Massachusetts*, 2 F.3d 1221 (1st Cir. 1993); *see also Dunkin' Donuts Franchised Rests. LLC v. ABM Donuts, Inc.*, 2011 U.S. Dist. LEXIS 139074 (D.R.I. 2011) ("The *sine qua non* of the four part test is likelihood of success on the merits: if the moving party cannot demonstrate that it is likely to succeed in its quest, the remaining factors become matters of idle curiosity.")

The stay in this proceeding should be terminated because plaintiffs do not meet the threshold requirement of likelihood of success on the merits. Also, plaintiffs have failed to provide any evidentiary support for their baseless allegations or any entitlement to injunctive relief pursuant to the requirements of Rule 65. Significantly, plaintiffs do not have standing to contest the assignment of mortgages by MERS as nominee for the lender, its successors and assigns because, quite simply, they are not a party to the contract nor a beneficiary thereof. Moreover, as will be discussed *infra*, and as *Bucci* confirmed, under Rhode Island law, MERS has the right to be the mortgagee and to hold, assign and foreclose mortgages.

## IV.   Plaintiffs Do Not Meet the Threshold of Likelihood of Success on the Merits

### A.   Application of State Law.

As a preliminary matter, both the Rhode Island Supreme Court and the Rhode Island Superior Court have addressed MERS' ability to hold, assign and foreclose on mortgages it holds in Rhode Island. These cases are discussed in detail below. In ruling in this case, the proper and only application of law with respect to MERS' role as mortgagee, and mortgage assignments and mortgage foreclosures arising from mortgages in which MERS was the original mortgagee, should be the judicial determinations in cases from the Rhode Island Supreme and Superior Courts. This Court's jurisdiction lies in diversity and thus requires application of Rhode Island

7338021.2

substantive law in deciding all state law claims in this action. *Miree v. DeKalb County, Ga.,* 433 U.S. 25, 28, 97 S.Ct. 2490 (1977) ("Since the only basis of federal jurisdiction alleged in the petitioner's claim against respondent is diversity of citizenship, 28 U.S.C. §1332, the case would unquestionably be governed by Georgia law …"); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state.").

      B.    <u>Plaintiffs Lack Standing to Challenge MERS' Mortgage Assignments.</u>

Plaintiffs do not meet the threshold requirement of reasonable probability of success on the merits because plaintiffs lack standing to contest the assignment of mortgages. Rhode Island law provides that a plaintiff who is not a party to, or intended third party beneficiary of a contract lacks standing to bring claims seeking to invalidate the contract. The Rhode Island Supreme Court has consistently held that only parties to a contract may seek to have rights declared under that agreement. *DePetrillo v. Belo Holdings*, 45 A.3d 485, 491-92 (R.I. 2012); *Brough v. Foley*, 525 A.2d at 922. Specifically, in *Brough*, 525 A.2d at 922, the Rhode Island Supreme Court concluded that a stranger to the assignment of a right of first refusal lacked standing to litigate the validity or transfer of rights under that agreement. The Rhode Island Superior Court also held that "homeowners lack standing to challenge the propriety of mortgage assignments and the effect those assignments could have, if any, on the underlying obligation." *Payette v. Mortgage Electronic Registration Systems*, PC 2009-5875, 2011 R.I. Super. LEXIS 117 (August 22, 2011); *see also Rutter v. Mortgage Electronic Registration Systems, Inc.*, PC 2010-4756, PD 2010-4418 2012 R.I. Super LEXIS 39 (March 12, 2012) ("The principle that a non-party to the contract does not have standing to challenge the contract's subsequent assignment is well established.").

7338021.2

The United States Court of Appeals for the First Circuit recently issued a decision discussing plaintiff's standing to contest mortgage assignments in the context of mortgage foreclosures. *See Culhane v. Aurora Loan Servs. of Neb.*, 708 F.3d 282 (1st Cir. 2013). The Court, applying only Massachusetts law, found that the plaintiff did have standing to challenge a mortgage assignment, but only on a limited basis. *Id.* at 290 ("we hold only that Massachusetts mortgagors, under circumstances comparable to those in this case, have standing to challenge a mortgage assignment … [t]he short of it is that, in Massachusetts, a mortgagor has a legally cognizable right to challenge a foreclosing entity's status qua mortgagee."). The *Culhane* Court's reasoning on standing is inapplicable to the cases that make up the Mortgage Foreclosure Docket, and to the extent that plaintiffs in the Mortgage Foreclosure Docket rely on *Culhane* to support arguments as to standing, such reliance should be rejected. The *Culhane* Court was sitting in diversity, and as explained above, was required to apply Massachusetts law because the plaintiffs resided in and subject property was located in Massachusetts. It has no application to Rhode Island.

In the Mortgage Foreclosure Docket, plaintiffs allege various state law causes of action and the Court must apply Rhode Island law. Even after the First Circuit issued *Culhane*, Rhode Island Superior Courts have continued to find that a plaintiff/mortgagor lacks **any** standing to challenge the validity of a mortgage assignment under Rhode Island law. *Seng v. Mortg. Elec. Registration Sys., Inc.*, No. PC 2011-2784, 2013 R.I. Super. LEXIS 59 (R.I. Super. April 3, 2013); *Van Hoecke v. First Franklin Financial Corp., et al.*, No. KC 2009-0743, 2013 R.I. Super. LEXIS 43 (R.I. Super. March 7, 2013) (Rubine, J.). In these more recent decisions, the Superior Court recognized the *Culhane* decision and its applicability under Massachusetts law. *Id.* However, the Superior Court concluded that it is required to apply Rhode Island common

13

law, and found that Rhode Island law prohibits a non-party from making any form of challenge the assignment of a contract.  *Id.*  *Culhane* allows that a "mortgagor has standing to challenge a mortgage assignment on the basis that the assignor had no interest to assign" but does not have "standing to assert defects in the execution of a particular mortgage assignment."  By contrast, the *Bucci* Court confirmed that MERS holds an interest in each mortgage pursuant to its legal title as mortgagee, as nominee for the lender, its successors and assigns.  *Bucci* at *49.  Accordingly, even assuming that this Court were to apply the *Culhane* analysis to MERS in Rhode Island, plaintiffs would still lack standing to challenge an assignment by MERS.

Rhode Island law also does not provide plaintiffs in the Mortgage Foreclosure Docket with any legal basis to challenge alleged defects in the execution of assignments because plaintiffs are not party to the agreements to assign.  *DePetrillo v. Belo*, 45 A.3d at 491-92 (R.I. 2012) ("This Court consistently has stated that as a necessary predicate to pursuing a declaratory judgment, a plaintiff must have standing [and] we have indicated that an individual who was not a party to a contractual agreement lacks standing to challenge its validity."); *Brough v. Foley*, 525 A.2d at 922; *Seng v. Mortg. Elec. Registration Sys., Inc.*, PC 2011-2784, 2013 R.I. Super. LEXIS 59; *Porter v. First NLC Fin. Serv.*, PC 10-2526, 2011 R.I. Super. LEXIS 45; *Rutter v. Mortg. Elec. Registration Sys., Inc.*, PC 2010-4756, PD 2010-4418, 2012 R.I. Super LEXIS 39 (R.I. Super. Mar. 12, 2012).  Accordingly, plaintiffs have no standing in the cases making up this docket and thus cannot meet the threshold requirement of likelihood of success.  Therefore, there is no need to consider the other elements for injunctive relief, as they would be "matters of idle curiosity."  *See Dunkin Donuts Franchised Rests. LLC* at *7.

Rhode Island law is more consistent with the U.S. Supreme Court's understanding that non-parties cannot and should not be allowed to litigate or enforce the rights of another,

7338021.2

particularly where that other party has not made a claim of its own volition.  *See Kowalski v. Tesmer*, 543 U.S. 125, 129-130 (2004).  Generally, each party is in the best position to litigate its own rights, even where those rights may have collateral effects on other parties.  *See Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("… even when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, this Court has held that the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.").  This prudential standing consideration serves to ensure that the party with the "appropriate incentive" to raise a challenge (or to choose not to) does so with "the necessary zeal and appropriate presentation."  *Kowalski*, 543 U.S. at 129.  The exceptions to this requirement occur only when "the party asserting the right has a 'close' relationship with the person who possesses the right" and when "there is a hindrance to the possessor's ability to protect his own interests."  *Id.* at 130.  Even these exceptions noted by the U.S. Supreme Court focus on ensuring that the interests of the party whose rights are at issue are being served.

With regard to the mortgage assignment in these hundreds of cases, the parties whose rights are at issue are MERS as the assignor and the various mortgage assignees.  Plaintiffs cannot claim a "close relationship" with the parties to the mortgage assignments and there is no "hindrance" preventing those parties from asserting their own rights.  *See Latin Am. Music Co. v. The Archdiocese of San Juan of the Roman Catholic & Apostolic Church*, 499 F.3d 32, 45-46 (1t Cir. 2007) (copyright holder had no standing to seek rescission of agreement for royalties between music composers and publishers based on alleged violations of rights of composers.).  Significantly, neither MERS nor any of the mortgage assignees challenge the validity of the assignments. [4]

---

[4] Further, the assignees' subsequent conduct in pursuing mortgage foreclosure works as a form of ratification of the

7338021.2

C.      MERS as Nominee is an Effective Agency Designation.

Uniform instruments designating MERS as mortgagee clearly disclose that MERS serves

as the mortgagee, as nominee for the lender, its successors and assigns.  Blake Dec. ¶ 9.  In this

role, MERS represents the interests of the lenders at the execution of the note and mortgage, as

well as any other party to whom the lender transfers the note.  See for example, *Restatement of*

*Agency 3d* §1.04 (Generally, an agent has capacity to function on behalf of disclosed and well as

undisclosed principals.) This agency authority is disclosed through the mortgage contract and

explicitly granted pursuant to the MERS® System Rules of Membership; which provides in

pertinent part that:

> … each Member, at its own expense, shall cause "Mortgage
> Electronic Registration Systems, Inc." to appear in the applicable
> public land records as the Mortgagee of Record as Nominee for the
> Note Owner and its successors and/or assigns …

Blake Dec. Exhibit 3, Rule 2, Section 4.

> The Member agrees and acknowledges that when MERS is
> identified as Nominee of the "lender and lender's successors and
> assigns" in the Security Instrument, MERS as Nominee, is the
> Mortgagee of Record, in the Security Instrument for and on behalf
> of the Note Owner and/or the Note Holder.

*Id*. at Exhibit 3, Rule 8, Section 1(b).

---

assignments.  *See Kiah v. Aurora Loan Servs., LLC*, C.A. No. 10-40161-FDS, 2011 WL 841282, at *6-7 (D. Mass. Mar. 4, 2011), *aff'd., Kiah v. Aurora Loan Services, LLC*, No. 11-1010 (1st Cir. December 14, 2011) ("… MERS, a defendant in this case, does not contest the assignment."); *Yuille v. Am. Home Mortg. Servicing, et al.*, 2010 U.S. Dist. LEXIS 113300 (E.D. Mich. 2010) (citing *Long v. City of Monroe*, 265 Mich. 425, 441 (1933) ("[W]here a corporation has authorized or ratified the signature of its name in such a manner as to bind the corporation itself, whether such authority or ratification were express or formal **or arose from acquiescence and inaction**, the signature cannot be disputed by any third party for the purpose of invalidating the [document] which the corporation itself cannot or does not attack.") (emphasis added); *aff'd sub nom. Yuille v. Am. Home Mortgage Servs., Inc.*, No. 10-2564 (6th Cir. May 29, 2012) ("[A]ny defect in the written assignment of the mortgage would make no difference where both parties to the assignment ratified the assignment by their subsequent conduct in honoring its terms … Yuille, as a stranger to the assignment, lacked standing to challenge its validity.").

7338021.2

MERS® System Member lenders agree to accept such Rules of Membership and other governing documents by signing the MERS application when they become MERS Members. Blake Dec. ¶*14* . Mortgage lenders and homeowners also accept MERS' nominee role or agency in the mortgage transaction when the lender utilizes the mortgage identifying MERS as mortgagee in the loan closing and homeowners subsequently sign the mortgage instrument. *Id.* at ¶ 9 *see also Bucci* at *28-29.  Plaintiffs seek to have this Court disregard the lender's clear delegation of authority to MERS, as its agent in the MERS Mortgage, and the borrower's explicit acknowledgement and acceptance of MERS as the agent of the lender, and its successors and assigns.  See Blake Dec. ¶ 8 for a description of the MERS Mortgage. The *Bucci* Court  held that the Superior Court in *Bucci* was correct when it found that "MERS is the mortgagee because the Mortgage executed by [plaintiffs] so states,' and '[t]he fact that MERS acts in a nominee capacity for the lender and the lender's successors and assigns does not diminish MERS' role as mortgagee[,] …  Therefore, MERS' designation as nominee under the mortgage, albeit as the holder of legal title only, does not proscribe its authority to exercise the power of sale under the provisions of § 34-11-22." *Bucci* at *41.  While the *Bucci* Court was focused on MERS ability to exercise the power of sale, the Court unambiguously accepted MERS' agency based on its contractual agreements with its Members, to wit:

> Even if plaintiffs had not waived this [agency] argument, we nonetheless believe that it lacks merit because of MERSCORP's rules of membership to which each member has agreed.  Indeed, other courts have held that a contractual relationship exists between MERS and its members, which allows MERS to act on their behalf.  *See*, *e.g.*, *Taylor v. Deutsche Bank National Trust Co.*, 44 So.2d 618, 620 (Fla. Dist. Ct. App 2010) ("The participants agree to appoint MERS to act as their common agent on all mortgages registered by them in the MERS system."); *MERSCORP, Inc. v. Romaine*, 8 N.Y.3d 90, 861 N.E.2d 81, 83, 828 N.Y.S.2d 266 (N.Y. 2006) ("Members contractually agree to

7338021.2

appoint MERS to act as their common agent on all mortgages they register in the MERS system").

*Bucci*, 2013 R.I. Lexis 52 at *33 n. 12.

It is important to emphasize that MERS' agency relationship with its Members is not a question of fact.   Rather as *Bucci* confirmed,   the MERS Mortgage discloses the agency relationship on its face, that is, apparent authority, as well as its use by the Member lenders in exchange for loaning millions of dollars in the aggregate, in the primary mortgage market, all in reliance on the MERS Mortgage as a lawful and enforceable security instrument.   In *Bucci*, the Supreme Court cited favorably to the Superior Court's findings with respect to MERS' agency:

> Moreover, although Lehman Brothers never signed the mortgage designating MERS as its nominee, the trial justice nonetheless found that it had authorized MERS to act in this capacity when it disbursed the loan funds to plaintiffs.   The trial justice reasoned that '[i]f Lehman [Brothers] had not approved of MERS acting as its nominee, [i]t would not have disbursed the loan proceeds to the Buccis'.

*Bucci* at *15-16

Accordingly, mortgagors  in default should not be heard to dispute this express agency delegation.   For this Court to hold otherwise would allow mortgagors, who already breached their mortgage loan contracts by defaulting, to subvert the intent and will of parties at the time they made their loan agreements, as well as the Rhode Island legislature's  provision for non-judicial foreclosures, by effectively converting every mortgagee's exercise of the statutory power of sale into a judicial foreclosure.   Clearly, this is not what the legislature or the parties intended and would constitute a perversion of the statutes of Rhode Island.

In addition, the *Bucci* Court recognized that parties to contracts have substantial freedom to establish the terms of their private contracts, such as the Buccis and Lehman Brothers Bank in

*Bucci*, or Dino Alves and Robin Alves and Wilmington Finance, a division of AIG Federal Savings Bank in the Alves Mortgage, and that such contracts deserve to be enforced, to wit:

> This Court has recognized that, in such private transactions, "competent persons shall have the utmost liberty of contracting and that their agreements voluntarily and fairly made shall be held valid and enforced in the courts[ ] unless a violation of the law or public policy is clear and certain." *Gorman v. St. Raphael Academy*, 853 A.2d 28, 38 (R.I. 2004) (quoting *Wechsler v. Hunt Health Systems, Ltd.*, 216 F.Supp.2d 347, 354-55 (S.D.N.Y. 2002) (emphasis added)). **In our opinion, the designation of MERS as grantee of the mortgage, as nominee for the lender, was not a "clear and certain" violation of § 34-11-22.** *Gorman*, 853 A.2d at 38 (quoting *Wechsler*, 216 F.Supp.2d at 355).

> Emphasis added.

Because the *Bucci* Court upheld the validity of the Bucci mortgage, which is a standard form of MERS Mortgage, used throughout Rhode Island, this Court should also recognize its validity, terminate the stay, and allow the defendants in the Mortgage Foreclosure Docket to proceed with their enforcement remedies as lawfully assigned to them by MERS. In an apparent attempt to reargue *Bucci* and claim that there is no agency relationship between MERS and its Members, in their memorandum dated June 27, 2013, plaintiffs bring nothing new to the Court in their 41 page brief. See Mortgage Foreclosure Docket Number 2172. The cases cited by plaintiffs are easily distinguishable from the facts of the cases at hand. For example, *Rainey v. Town of Warren*, 80 F.Supp.2d 5 (D.R.I. 2000) involved a relationship between local unions and parent unions. The *Rainey* Court recognized the complexity of this relationship between parent and local unions and determined that because of the diverse situations possible in the varied relationships, an individual examination of the facts was necessary. Here, when looking at the allegations specific to the MERS defendant solely, there is no such varied relationship. Each MERS® System Member agrees to "abide by the same MERS® System Rules of Membership"

and must follow the same rules.  Blake Dec. ¶ 14. In *Gomez v. Rivera Rodriguez*, 344 F.2d 103 (1st Cir. 2003), the Court held that an agency relationship could not be proven solely by the unsupported out-of-Court statements of the claimed agent.  This case is also distinguishable from *Bucci* because the agency relationship is supported by evidence in the form of the MERS Governing Documents, and the publicly recorded MERS Mortgage.  Plaintiffs' counsels attempt to rehash the arguments made on behalf of the *Bucci* appellants and seek to draw the Court's attention away from the clear finding of MERS' agency relationship—regardless of whether MERS submitted documents beyond the publicly available mortgage as proof.

The *Bucci* Court also indicated that it has embraced the common definition of a nominee in the past, that is, a nominee is simply "[a] person designated to act in place of another * * *" *Plainfield Pike Gas & Convenience, LLC v. 1889 Plainfield Pike Realty Corp.*, 994 A.2d 54, 56 n.5 (R.I. 2010) (quoting Black's Law Dictionary 1149 (9th ed. 2009); *accord*, *Weingartner v. Chase Home Finance LLC*, 702 F.Supp.2d 1276, 1279 (D. Nev. 2010); *In re Huggins*, 357 B.R. 180, 183 (D. Mass. 2006), or "[a] party who holds bare legal title for the benefit of others[,]" 994 A.2d at 56 n.5 (citing Black's Law Dictionary *supra* at 1149); *accord*, 702 F.Supp.2d at 1279. Both definitions envelop the common essential characteristic "that a nominee is a kind of agent working for the benefit of another." *Weingartner*, 702 F.Supp. at 1279.  A nominee's legal title is an interest in a lien that has been recognized as

> sufficient to bring an action at law and is therefore a species of property protected by due process.  The Supreme Court of the United States has held that claims similar to the lien rights MERS holds as nominee for its lenders are entitled to due process protections.

*Bellistri* at 34.

The United States Supreme Court addressed the issue of standing of a party with legal title to enforce payment in *Sprint Communications Co. v. APCC Services, Inc.*, 544 U.S. 269, 128 S. Ct. 2531 (2008). In *Sprint*, payphone owners assigned their claims for collection against long distance carriers to APCC for collection and APCC agreed to remit all proceeds of the litigation back to the assignors. APCC had a comparable interest to that of MERS: a bare legal title to the claims but no equitable or beneficial interest therein. The Supreme Court held that this interest was sufficient to confer standing to sue in federal court.

As part of its analysis, the United States Supreme Court recognized that:

> [F]ederal courts routinely entertain suits which will result in relief for parties that are not themselves directly bringing suit. Trustees bring suits to benefit their trusts; guardians ad litem bring suit to benefit their wards; receivers bring suit to benefit their receiverships; assignees in bankruptcy bring suit to benefit bankrupt estates; executors bring suits to benefit testator estates; and so forth. 128 S. Ct. at 2543.

By contrast to the plaintiffs disregard for the authority of MERS, as nominee, with legal title, to act on behalf of the lender, its successors and assigns, the *Bucci* Court, in accord with the reasoning in *Culhane* concluded that "MERS's role as mortgagee of record and custodian of the bare legal interest as nominee for the member-noteholder, and the member-noteholder's role as owner of the beneficial interest in the loan, fit comfortably with each other and fit comfortably within the structure of Massachusetts mortgage law. We believe that they reside comfortably within the law of [the State of Rhode Island] as well." *Bucci* at *48-49 Accordingly, the *Bucci* Court, concluded that "MERS, as the holder of legal title, may be denominated as the mortgagee in the mortgage and may foreclose on behalf of the note owner." *Bucci* at *49-50. Similarly, the MERS Mortgage expressly authorizes MERS "to take any action required by Lender, including but not limited to, releasing and canceling this Security Instrument." Blake Dec. at Exhibit 1. As

7338021.2

demonstrated *infra*, this authority includes the execution of assignments, releases, discharges and other documents that the lender would be able to execute.

      D.    <u>MERS has the Ability to Assign Mortgages</u>.

Even if plaintiffs' claims did not fail for lack of standing, Rhode Island courts have uniformly upheld MERS' ability to hold, assign and enforce interests it holds as mortgagee. Recognizing the large influx of wrongful mortgage foreclosure cases entering the state court system, by Administrative Order No. 2010-14, all cases involving MERS in the Rhode Island Superior Court were combined onto a single docket ("MERS Docket"). The Honorable Allen P. Rubine was assigned the MERS Docket for the purposes of presiding over trials as well as consistent adjudication by managing, supervising, scheduling and disposing of such cases. *See* Exhibit G for a copy of the Order establishing the MERS Docket. As such, the vast majority of the case law regarding assignment of mortgages in foreclosure cases, the standing to challenge these assignments, and the ability of MERS to foreclose on these mortgages has been and is now being decided by the Rhode Island Superior Court and is thus the prevailing view of the law on this subject in Rhode Island, absent a decision from the Rhode Island Supreme Court. *See e.g.* *Hernandez v. MERS*, PC 2010-1212, 2012 R.I. Super. LEXIS 187 (R.I. Super. December 7, 2012) ("… in the absence of controlling authority from the Rhode Island Supreme Court, the reasoning and result of Superior Court decisions on this subject represent the prevailing view of the law in Rhode Island with respect to this issue [the issue being MERS' involvement in the foreclosure process]. The decisions of the Superior Court unanimously support this result.").

In addition to barring all forms of mortgagor interference with MERS' manner of assigning its mortgages, the Rhode Island Superior court has resolutely upheld MERS' <u>right</u> to assign mortgage interests. In *O'Brien v. MERS*, KC 2009-1695, 2012 R.I. Super. LEXIS 84

(June 4, 2012), the Court rejected the argument that MERS lacked authority to assign, finding that the "[m]ortgage instrument expressly permitted assignment of the mortgage instrument by MERS and the authority was specifically approved by the mortgagor … [a]ccordingly, MERS had the authority to assign the mortgage interest to" the bank.  2012 R.I. Super. LEXIS 84 at *12-13.  In its analysis, the Court noted that "there is no requirement that the note-holder and mortgagee be the same party at the time of the foreclosure sale."  *Id.*, *citing Rutter,* PC 2010-4756, PD 2010-4418, 2012 R.I. Super. LEXIS 39.   The Court also found no authority under Rhode Island law stating that the bank should record a power of attorney in order for MERS to act on its behalf as it's nominee.  *O'Brien*, KC 2009-1695, 2012 R.I. LEXIS at *8.

Similarly, in *Kosiba v. MERS*, KC 2011-0874, 2012 R.I. Super. LEXIS 98 (June 25, 2012), the Court held that under Rhode Island law the note-holder and mortgagee need not be the same party.   2012 R.I. Super. LEXIS at *10.   The Court also held that "[o]nce the lender designates MERS as its nominee, MERS and thus any assignee of MERS, also acts as holder of the debt secured by the mortgage and has the authority to assign or enforce the mortgage interests."  *Id.* at *14.  *See also, Payette v. MERS*, PC 2009-5875, 2011 R.I. Super. LEXIS 117 at 17-19 (August 22, 2011) ("Plaintiffs unequivocally permitted the lender to assign the mortgage to MERS.  Plaintiffs cannot now claim that MERS, to which Plaintiffs specifically approved granting all the rights of the lender, could not take that very same action expressly permitted of the lender."); *Estrella v. Mortgage Elec. Registration Sys., Inc.*, PC 2010-6940, R.I. Super. LEXIS 108 at *6 (July 10, 2012)("[], as mortgagee, MERS, as well as the successors and assigns of MERS, were unequivocally granted the statutory power of sale by the plain unambiguous language of the Mortgage in the Mortgage instrument as acknowledged and executed …").

The common thread in all of MERS' assignments is that MERS is granted explicit authority pursuant to the mortgage instrument which authorizes MERS to assign the mortgages. This is the same authority that appears repeatedly in all mortgages wherein MERS is designated as the original mortgagee, as nominee for the lender, its successors and assigns with the following text:

> Borrower does hereby mortgage, grant and convey **to MERS**, (solely as nominee for Lender and Lender's successors and assigns) **and to the successors and assigns of MERS**, with Mortgage Covenants upon the Statutory Condition and with the Statutory Power of Sale, the [mortgaged] property * * *."  The mortgage further provides:

> "Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property * * *."

> *Bucci*  at *27-28. (emphasis added).

In *Bucci*, the Supreme Court analyzed this same text and concluded that "[t]hese provisions are clear and leave no room for interpretation." *Id*. at *28. The Court concluded that the "plaintiffs [mortgagors] explicitly granted the statutory power of sale and the right to foreclose to MERS and consequently, MERS has the contractual authority to exercise that right." *Id.*

This is the same text included in the Alves Mortgage, yet Alves filed their complaint after *Bucci* was decided and the allegations in that complaint speak as if the Supreme Court never decided *Bucci*.  Plaintiffs cannot now turn around and claim that MERS lacks the authority to do something that the Plaintiffs specifically granted to it in signing the mortgages, that is, execute

releases, discharges, assignments and other documents that the lender could itself execute and the *Bucci* Court confirmed.

Moreover, plaintiffs' repeated "allegations with respect to the invalidity of the assignment of Mortgage interest are merely 'conclusory statements' which are insufficient to survive a motion to dismiss. Plaintiff has failed to allege facts in the Complaint which 'raise a right to relief above the speculative level.' Therefore, the assignment is presumptively valid." (internal citations omitted), *see Rosano v. Mortgage Electronic Registration Systems, Inc. et al.*, PC 2010-0310, 2012 R.I. Super. LEXIS 95 at *14 (June 19, 2012). The "presumption of law is in favor of the validity of the assignment and the good faith of the transactions thereunder, …." *See Dolan v. Hughes*, 20 R.I. 513, 40 A. 344 (1898), citing *Johnson v. Thayer*, 17 Me. 403 (1840). Absent the stay imposed by the District Court, MERS would have been able to move to dismiss every one of the unfounded complaints in the Mortgage Foreclosure Docket naming MERS as a defendant or, alternatively, seek to strike all allegations against MERS (where MERS is not named a defendant) because they lack any standing or evidentiary basis.[5]

E.    Underline: MERS has the Ability to Exercise the Statutory Power of Sale.

In *Bucci*, the Rhode Island Supreme Court held that MERS, acting as nominee for Lehman Brothers Bank, FSB, and its successors and assigns, holding only legal title to the mortgage, although not the holder of the promissory note, is the mortgagee and may exercise the statutory power of sale contained in the mortgage and undertake a non-judicial foreclosure of the mortgage. The Court agreed with the reasoning and conclusion of the Superior Court that "the [m]ortgage specifically granted the Statutory Power of Sale to MERS, and therefore, MERS has

---

[5] MERS previously put the plaintiffs' attorneys in the Mortgage Foreclosure Docket on notice of their need to discontinue their erroneous legal arguments as to MERS' interests in contravention of the Supreme Court *Bucci* decision. See Exhibit F.

the contractual authority to exercise that power." *Id.* at *27-29 (internal quotations omitted). The Court reviewed the text of the mortgage and found its terms to be unambiguous by which "the plaintiffs explicitly granted the statutory power of sale and right to foreclose to MERS." *Id.* at *28. By executing the Note and Mortgage, Bucci agreed that MERS could initiate a non-judicial foreclosure on behalf of the holders of his Note, as the Note Holders' nominee and agent. *See also Sharkey v. Prescott*, 19 A.3d 62, 68 (R.I. 2011) ("[I]t has long been a settled principal that 'a party who signs an instrument manifests his assent to it[.]'") (quoting *Shappy v. Downcity Capitol Partners, Ltd.*, 973 A.2d 40, 46 (R.I. 2009)).

This language is the very same text contained in the Alves Mortgage and all uniform Fannie Mae/Freddie Mac mortgages used in Rhode Island in which MERS is identified as the original mortgagee. As set out more fully in the Blake Dec. ¶ 8, Exhibit 1, the use of MERS for Members of the MERS® System, as described by the mortgages, as a mortgagee "solely as nominee for the Lender and Lender's successors and assigns," is essential to one of the central objectives of the agreement comprised of the note and mortgage – that they be freely transferable and that MERS can "take any action required of Lender." To promote that objective, borrowers agreed to give MERS "the right to foreclose and sell the property" non-judicially, thus granting MERS the right to foreclose in accordance with the procedures set forth in the "Statutory Power of Sale, but only on behalf of, and "as nominee for" the original holder of the note and each successive note holder – who in these cases were all MERS® System Members whose instructions MERS was obligated to comply with under the MERS® System Rules of Membership.

As noted earlier, the *Bucci* Court rejected the argument that MERS was not the lawful agent of the lender and it successors and assigns, premised not only on "MERSCORP's rules of

membership to which each member has agreed", but also because "the current beneficial owner of the note contractually agreed to allow MERS to foreclose on its behalf, we need not address plaintiffs other arguments regarding MERS's contractual ability to be the nominee of the current owner of the note." Id. at 33, note 12, and there was no need to demonstrate that a written power of attorney existed Id. at 30, citing to UXB Sand & Gravel, Inc. v. Rosenfeld Concrete Corp., 641 A.2d. 75, 79 n.1 (R.I. 1994) ("an agent's authority to bind the principal need not be in writing.") The Court  rejected the plaintiffs' arguments that Rhode Island statutes prohibit MERS from serving as the contractual mortgagee or conducting mortgage foreclosures, determining that while MERS' foreclosures may not be explicitly authorized by statute, MERS is "not explicitly precluded" from undertaking non-judicial foreclosures pursuant to the statutory power of sale. Id. at 42.  The Supreme Court also analyzed Eaton v. Federal National Mortgage Association, 969 N.E. 2d 1118 (Mass. 2012) and Culhane, 708 F.3d 282, in concluding that "we see no reason why MERS, as an agent of the owner of the note, cannot foreclose on behalf of that entity."  Id. at *51.  It is important to note that while the Culhane Court ruled that plaintiffs did have standing under Massachusetts law to challenge assignments of mortgages, the First Circuit dismissed plaintiff's challenge to MERS' authority to foreclose for several reasons: (1) "there is no reason to doubt the legitimacy of the common arrangement whereby MERS holds bare legal title as mortgagee of record and the noteholder alone enjoys the beneficial interest of the loan."; (2) "[i]n Massachusetts, the note and the mortgage need not be held by the same entity."; (3) "[t]he mortgagee need not possess any scintilla of a beneficial interest in order to hold the mortgage"; and (4) "MERS's role as mortgagee of record and custodian of the bare legal interest as nominee for the member-noteholder, and the member-noteholder's role as owner of the beneficial interest

in the loan, fit comfortably with each other and fit comfortably within the structure of Massachusetts mortgage law." *Id.* at 291-93.

The Supreme Court's decision in *Bucci* is an explicit recognition of MERS' ability to exercise the statutory power of sale in Rhode Island—both pursuant to applicable statutes and mortgage contract, and perforce,  MERS is entitled to exercise all other powers that the lender could exercise pursuant to the mortgage contract and applicable statutes.  Plaintiffs' arguments to the contrary cannot be substantiated and thus they have failed to meet the threshold requirement of likelihood of success on the merits.

## CONCLUSION

For all of the foregoing reasons, MERS respectfully requests that this Court terminate the stay in the Mortgage Foreclosure Docket, and grant such other relief as the Court deems just and proper.


**DATED:**         July 5, 2013

Respectfully submitted,

**PARTRIDGE SNOW & HAHN LLP**

By:____/s/ David J. Pellegrino_____
                David J. Pellegrino

180 South Main Street
Providence, RI 02903
Phone: (401) 861-8200
Fax: (401) 861-8210
E-mail:  djp@psh.com
*Attorney for Defendant,*
*Mortgage Electronic Registration*
*Systems, Inc. ("MERS")*

28

**HISCOCK & BARCLAY, LLP**
(motion and application pending *pro hac vice*)

By:￼    /s/ Charles C. Martorana
                Charles C. Martorana

1100 M & T Center
Three Fountain Plaza
Buffalo, NY 14203
Phone: (716) 566-1512
Fax:  (716) 846-1208
E-mail:  CMartorana@hblaw.com
*Attorney for Defendant,*
*Mortgage Electronic Registration*
*Systems, Inc. ("MERS")*

29

**EXHIBIT A**

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND
_____

                                   )

IN RE MORTGAGE FORECLOSURES    )           Misc. No. 11-mc-88-M-LDA
_____)

### DECLARATION OF BRIAN BLAKE IN SUPPORT OF
### MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.

I, Brian Blake, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following statements are true and correct:

1.      I am over 18 years of age and am legally competent and able to make this declaration, which is based upon my personal knowledge.

2.      I am Corporate Counsel for MERSCORP Holdings, Inc. ("MERSCORP") and its subsidiary, Mortgage Electronic Registration Systems, Inc. ("MERS") and respectfully submit this declaration in support of MERS' memorandum of law dated July 5, 2013, in response to the Court's Order dated June 19, 2013 regarding whether the Plaintiffs have established the right to injunctive relief in connection with the Mortgage Foreclosure Cases (11-mc-88-M-LDA).

3.      MERSCORP owns and operates an electronic registry which electronically tracks transfers of beneficial ownership interests in promissory notes and loan servicing rights associated with mortgage loans (the "MERS® System"). MERSCORP operates the MERS® System in all fifty states, and the District of Columbia. MERS Mortgages (as more fully described herein) are regularly used by the mortgage lending industry to facilitate residential mortgage loans for millions of Americans, by primary mortgage lenders and in the multi-trillion dollar secondary mortgage markets, are regularly accepted by over 3,000 county clerks and other public land recorders throughout the United States, including in Rhode Island.

4.      MERS holds mortgage liens as the mortgagee in county land records, on behalf of, or as nominee or agent for, mortgage lenders and their successors and assigns. MERS is not a

mortgage loan originator, lender or servicer.  Members of the MERS® System include mortgage lenders, investors, servicers, title associations, and insurance companies (collectively, "MERS® System Member").

5.      MERS, the MERS® System, and MERS' role has been discussed and explained in many court decisions, in the United States, including recently in *Bucci v. Lehman  Brothers Bank, et al.*, 2013 R.I. LEXIS 52  (April 12, 2013).

6.      As background, in 1993, the Government National Mortgage Association ("Ginnie Mae"), the Mortgage Bankers Association of America ("MBA"), the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac") and others in the real estate finance industry realized the need for and jointly created an electronic registration system and clearinghouse similar in concept and process to the Depository Trust Company for the securities industry.  MERS and MERSCORP were created to operate that registration system and facilitate the transfer of beneficial interests in mortgage loans by serving as the mortgagee of record in the county land records, as nominee for the lenders, their successors, and assigns.   MERS® System Members, including mortgage lenders and servicers, have contractually agreed to appoint MERS to be the mortgagee and serve as the common nominee or agent for all mortgage loans for which MERS is identified as the mortgagee.

7.      In a mortgage state such as Rhode Island, MERS becomes the mortgagee of record, on behalf of lenders, in one of two ways:  (i) the borrower and the lender specifically designate MERS as the mortgagee in the mortgage at the time the mortgage loan is originated (sometimes referred to by the acronym "MOM," standing for "MERS as Original Mortgagee"), or (ii) the lender delivers and records an assignment of the mortgage to MERS, so that MERS becomes the mortgagee of record in the land records in which the mortgage is recorded.  In either case, the security instrument qualifies as an acceptable mortgage for the MERS® System.

2

8.      Fannie Mae and Freddie Mac have approved of MERS Mortgages, as uniform mortgage loan security instruments for all fifty states and the District of Columbia. A copy of the Fannie Mae/Freddie Mac Uniform Instrument with Authorized Changes for MERS as Mortgagee ("MERS Mortgage") typically employed in Rhode Island is attached hereto as Exhibit 1.

9.      In the MERS Mortgage, the borrower(s) specifically designates MERS and its successors and assigns as mortgagee in the original security instrument.  The MERS Mortgage identifies the name and address of the grantor (the borrower), the lender, and MERS as the mortgagee.   It describes the secured real estate and references the note executed contemporaneously with the mortgage.   The mortgage is signed by the grantor and acknowledged by a notary.  The MERS Mortgage specifically states that MERS serves as the disclosed agent for the lender and the lender's successors and assigns and also grants MERS broad rights, as the named mortgagee for the lender and the lender's successors and assigns, to exercise any and all rights granted by the borrower(s) including, but not limited to, the right to foreclose and sell the property and take any action required by the lender including for example an assignment of the mortgage.  The MERS Mortgage is recorded in the appropriate county land records and all appropriate filing and recording fees are paid.

10.     Once MERS becomes the mortgagee of record, MERS remains the mortgagee of record when beneficial ownership interests or servicing rights to the indebtedness corresponding to the mortgage are sold from one party to another party, and the transfers are tracked electronically on the MERS® System.  At all times during this process, the original mortgage (or an assignment of mortgage to MERS if MERS is not the original mortgagee) remains of record in the county land records, providing notice to the public of MERS' disclosed role as the mortgagee and nominee for the lender and the lender's successors and assigns and so that third parties may provide MERS (on behalf of the current note owner(s)) notice of any legal

3

proceedings or other types of action pursued against the mortgaged property, including for example, real property tax foreclosure proceedings.

11.     A toll-free telephone number appears on each MERS Mortgage which any party can call to determine who is the current mortgage loan servicer of a loan registered on the MERS® System.  MERSCORP also maintains a website, www.mers-servicerid.org, which any party can access to obtain mortgage loan servicer contact information, typically by reference to the Mortgage Identification Number ("MIN") that is a unique tracking number assigned to each mortgage registered on the MERS® System.

12.     The MERS® System complements, but does not replace the county land records, by providing additional information that tracks transfers of beneficial interests and contractual servicing rights that is not typically recorded or available at county or other public land records, namely the information about the current mortgage loan servicer, and now, with the addition of MERS® InvestorID, the name of the current mortgage loan investor in most instances.

13.     When the beneficial interest in indebtedness is sold, the promissory note evidencing the indebtedness is typically negotiated by an endorsement and delivery of the note from the seller to the buyer, in accordance with the provisions of the Uniform Commercial Code. If, however, a MERS® System Member is no longer involved with the note after it is sold, an assignment of the corresponding mortgage from MERS to the person or entity who is not a MERS® System Member is executed by MERS and that assignment is recorded in the applicable public land records where the real estate is located, and the loan is "deactivated" from the MERS® System.  The MERS® System Member lender or servicer can have MERS assign the mortgage to it, if it decides to foreclose the mortgage.

14.     In addition to the nominee relationship disclosed in the MERS Mortgage, pursuant to MERS® System Rules of Membership, Rule 2, Section 5, MERS® System Members

appoint MERS to hold the mortgage as mortgagee on the lender's behalf, and on behalf of lender's successors and assigns ("MERS shall act as the Nominee of the Note Owner and the Note Owner's successors and/or assigns, including the Note Holder with respect to each MERS Loan that a Member registers on the MERS® System."). Attached hereto as Exhibit 2 is a form of the MERS® System Membership Application which includes, among other things, lender's covenant to "abide by the MERS® System Rules of Membership..." Attached hereto as Exhibit 3 is a copy of the current MERS® System Rules of Membership.

15. Consistent with the text in the MERS Mortgage, the MERS® System Rules of Membership define a "nominee" as "one designated to act for another as his representative in a limited sense; the agency relationship specifically expressed in the terms of the Fannie Mae/Freddie Mac Uniform Security Instruments identifying MERS as the Original Mortgage (MOM)." As such, MERS' actions with respect to the MERS Mortgage, such as providing an assignment, discharge, or foreclosure of a mortgage, are wholly consistent with and supportive of the beneficial interests of the Note Owner or Note Holder, and the actions of the Servicer or Subservicer, as the case may be, pursuant to MERS Rules of Membership Rule 2, section 5, Rule 8, section 1, and Rule 12, section 11.

16. Accordingly, MERS respectfully requests that this Court terminate the Stay Order dated August 16, 2011, as amended, and allow MERS or its assignees to exercise all of the rights granted to the mortgagee in the MERS Mortgages, that are part of the Mortgage Foreclosure Docket Misc. No. 11-mc-88-M-LDA.

[Signature Page Follows]

7347537.2

Dated:  July 3, 2013 at Reston, Virginia

Brian Blake

**EXHIBIT 1**

Fannie Mae/Freddie Mac Uniform Instrument with Authorized Changes for MERS as Mortgagee
("MERS Mortgage") typically employed in the State of Rhode Island.

# *SAMPLE*

**MERS language has been inserted as Blue text**

After Recording Return To:

_____

_____

_____

_____

_____**[Space Above This Line For Recording Data]**_____

## MORTGAGE

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21.  Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)  "Security Instrument"** means this document, which is dated _____, _____, together with all Riders to this document.

**(B)  "Borrower"** is _____.  Borrower is the mortgagor under this Security Instrument.

**(C)  "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(D)  "Lender"** is _____.  Lender is a _____ organized and existing under the laws of _____. Lender's address is _____.

**(E)  "Note"** means the promissory note signed by Borrower and dated _____, _____.  The Note states that Borrower owes Lender _____ Dollars   (U.S. $_____) plus interest.  Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than _____.

*SAMPLE*

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower.  The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider ☐ Condominium Rider ☐ Second Home Rider
☐ Balloon Rider ☐ Planned Unit Development Rider ☐ Other(s) [specify] _____
☐ 1-4 Family Rider ☐ Biweekly Payment Rider

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L)  "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation; or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter.  As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor  in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

*SAMPLE*

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender:  (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note.  For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with Mortgage Covenants upon the Statutory Condition and with the Statutory Power of Sale, the following described property located in the _____ of _____ _____:

               [Type of Recording Jurisdiction]          [Name of Recording Jurisdiction

which currently has the address of _____

                                                [Street]

_____, Rhode Island _____ ("Property Address"):

               [City]                          [Zip Code]

     TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property.  All replacements and additions shall also be covered by this Security Instrument.  All of the foregoing is referred to in this Security Instrument as the "Property."  Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

     BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record.  Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

     THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

After Recording Return To:

_____
_____
_____
_____


_____    **[Space  Above  This  Line  For  Recording  Data]**
_____


# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21.  Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)** **"Security  Instrument"** means  this  document,  which  is  dated _____, _____, together with all Riders to this document.
**(B) "Borrower"** is _____. Borrower is the mortgagor under this Security Instrument.
**(C) "Lender"** is _____. Lender is a _____ organized  and  existing  under  the  laws  of _____.            Lender's            address            is _____. Lender is the mortgagee under this Security Instrument.
**(D)** **"Note"** means  the  promissory  note  signed  by  Borrower  and  dated _____, _____.  The  Note  states  that  Borrower  owes  Lender _____ Dollars (U.S. $_____) plus interest.  Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than _____.
**(E) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(F) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(G) "Riders"** means all Riders to this Security Instrument that are executed by Borrower.  The following Riders are to be executed by Borrower [check box as applicable]:

□  Adjustable Rate Rider       □  Condominium Rider       □  Second Home Rider

**RHODE ISLAND**--Single Family--**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**          **Form 3040   1/01 (rev. 11/02)** *(page 1 of 16 pages)*

☐  Balloon Rider ☐  Planned Unit Development Rider ☐  Other(s) [specify]_____
☐  1-4 Family Rider ☐  Biweekly Payment Rider

**(H)  "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(I)  "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(J)  "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K)  "Escrow Items"** means those items that are described in Section 3.

**(L)  "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(M)  "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(N)  "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(O)  "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(P)  "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender:  (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note.  For this purpose, Borrower does hereby mortgage, grant and convey to Lender, with Mortgage Covenants upon the Statutory Condition and

with the Statutory Power of Sale, the following described property located in the
_____                                                of
_____:
      [Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]

which                currently                has                the                address                of
_____
                                        [Street]
_____, Rhode Island _____ ("Property Address"):
      [City]                                      [Zip Code]

      TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property.  All replacements and additions shall also be covered by this Security Instrument.  All of the foregoing is referred to in this Security Instrument as the "Property."

      BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record.  Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

      THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

      UNIFORM COVENANTS.  Borrower and Lender covenant and agree as follows:
      **1.  Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.**  Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note.  Borrower shall also pay funds for Escrow Items pursuant to Section 3.  Payments due under the Note and this Security Instrument shall be made in U.S. currency.  However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be

made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of

Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4.   Charges; Liens.**   Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any.  To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument.  If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien.  Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5.   Property Insurance.**   Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance.  This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.  What Lender requires pursuant to the preceding sentences can change during the term of the Loan.  The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably.  Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification.  Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.  Lender is under no obligation to purchase any particular type or amount of coverage.  Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect.  Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.  Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument.   These amounts shall bear interest at the Note rate from the date of

disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee.  Lender shall have the right to hold the policies and renewal certificates.  If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices.  If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.  Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly.  Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds.  Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower.  If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.  Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters.  If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim.  The 30-day period will begin when the notice is given.  In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property.  Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6.  Occupancy.**  Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7.  Preservation, Maintenance and Protection of the Property; Inspections.**  Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property.  Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition.  Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage.  If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes.  Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.  If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property.  If it has reasonable cause, Lender may inspect the interior of the improvements on the Property.  Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8.  Borrower's Loan Application.**  Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan.  Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9.  Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**  If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property.  Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding.  Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off.  Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so.  It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate

from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10.    Mortgage Insurance.**  If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender.  If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect.  Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance.  Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve.  Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance.  If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law.  Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed.  Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements.  These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses.  If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in

exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in

value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender

agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.**  Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.**  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.**  If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument.  Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged.  Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.  Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.**  The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without

prior notice to Borrower.  A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law.  There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note.  If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing.  If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action.  If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph.  The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.**  As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property.  The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual